# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

NATIONAL ASSOCIATION OF HOME )
BUILDERS, et al., )
                 )
       Plaintiffs, )
                 )
   v. )       **Civ. No. 00-379 (RJL)**
                 )       **and consolidated cases**
UNITED STATES ARMY CORPS OF )
ENGINEERS, et al., )
                 )
       Defendants. )

**FILED**

SEP 2 9 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## MEMORANDUM OPINION
(September 29, 2006) [#46, #47, #48, #60. #62]

Before the Court on remand are the parties' Cross-Motions for Summary Judgment.

In these three consolidated cases,[1] the plaintiffs[2] challenge nationwide permits ("NWPs")

issued under Section 404(e) of the Clean Water Act ("CWA") by the defendant U.S. Army

Corps of Engineers ("Corps") in March 2000 and January 2002. After considering the parties

motions, the opposition thereto, oral argument, supplemental briefing on the surviving

claims, and the record, the Court GRANTS all defendants Cross-Motions for Summary

Judgment and DENIES all plaintiffs' Cross-Motions for Summary Judgment.

---

[1]      The two other consolidated actions are: *National Federation of Independent Business v. U.S. Army Corps of Engineers*, Civ. Action No. 00-1404 and *National Stone, Sand & Gravel Association v. U.S. Army Corps of Engineers*, Civ. Action No. 00-558.

[2]      The plaintiffs in this case are the National Association of Home Builders ("NAHB"), the National Stone, Sand and Gravel Association ("NSSGA"), the American Road and Transportation Builders Association ("ARTBA"), the Nationwide Public Projects Coalition ("NPPC"), the National Federation of Independent Business ("NFIB"), and Wayne Newman.



# BACKGROUND[3]

Congress enacted the CWA to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To that end, the CWA prohibits a party from discharging pollutants, such as dredged or fill material, into navigable waters of the United States. *Id.* § 1311(a). Under the CWA, however, the Corps is authorized to allow such discharges through the issuance of permits, both general and individual. *Id.* § 1344. The purpose of general permits, including nationwide permits ("NWP"), issued under Section 404(e) of the CWA is to allow projects that cause minimal environmental impact to go forward with little delay or paperwork. 33 C.F.R. § 330.1(b) (explaining that general permits are "designed to regulate with little, if any, delay or paperwork certain activities having minimal impacts"). If a proposed activity meets the conditions for general permits, it need not be subjected to the individualized permit process through which the Corps makes determinations on discharges on a case-by-case basis. 33 U.S.C. § 1344. Specifically, Section 404(e) states that:

> the Secretary may, after notice and opportunity for public hearing, issue general permits on a State, regional, or nationwide basis for any category of activities involving discharges of dredged or fill material if the Secretary determines that the activities in such category are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment.

*Id.* § 1344(e)(1). Thus, the Corps has the discretion to issue such general permits if the

---

[3] This Background section is adapted from the Background section found in *National Association of Home Builders v. U.S. Army Corps of Engineers*, 297 F. Supp. 2d 74, 76-78 (D.D.C. 2003).

polluting activities are similar in nature and will only cause minimal environmental effects. *Id.* If a party discharges pollutants into navigable waters without meeting the conditions of a general permit or otherwise acquiring an individual permit, then the party can be subject to enforcement actions, such as a civil administrative action by the Corps or a civil and criminal proceeding by the Department of Justice. *Id.* § 1319(g); 33 C.F.R. §§ 326.5-326.6.

For five-year intervals, beginning in 1977, the Corps has issued NWPs, including the most widely used permit, NWP 26. 61 Fed. Reg. 65,874, 65,893 (Dec. 13, 1996). Before the relevant changes to the NWPs made in 2000, NWP 26 authorized discharges that affected up to ten acres of waters without requiring a party to acquire an individual permit, and required that a party notify a Corps' district engineer of any discharges causing loss or substantial adverse modification of one to ten acres of wetlands (this second requirement is known as a "pre-construction notification"). 61 Fed. Reg. 30,781, 30,783 (June 17, 1996). On June 17, 1996, the Corps proposed reissuing many of the NWPs, including NWP 26, which was to expire on January 21, 1997. *Id.* at 30,780. On December 13, 1996, the Corps reissued NWP 26 for a period of two years, with somewhat different conditions. 61 Fed. Reg. at 65,874, 65,877, 65,891, 65,895. In July 1998, the Corps published its proposed replacement permits, and extended the term of NWP 26 again. 63 Fed. Reg. 36,040 (July 1, 1998). Following a public comment period in which it received approximately 10,000 comments on the proposal, 64 Fed. Reg. 39,257 (July 21, 1999), the Corps set forth a second proposal regarding the other new permits in July 1999. *See* 64 Fed. Reg. 39,252 (July 21,

3

1999).  On March 9, 2000, after considering even more comments, the Corps issued the permits that replaced NWP 26.  *See* 65 Fed. Reg. 12,818. 12.818 (Mar. 9, 2000).

Overall this process resulted in five new NWPs (known collectively as "Replacement Permits"), modification of six existing NWPs, two new General Conditions ("GC"), and modification of nine existing GCs. *Id.*  These changes to the NWPs process authorized many of the same activities allowed under NWP 26, but the new and modified NWPs were activity-specific.  *See id.*  Among the controversial changes, the Corps narrowed the maximum per-project acreage impact from ten acres to a half acre, and pre-construction notification was required for impacts greater than one-tenth of an acre instead of one acre.[4] The new NWPs became effective on June 7, 2000, and NWP 26 expired the same day.  65 Fed. Reg. 14,255, 14,255 (Mar. 16, 2000).

NAHB's complaint was filed on February 28, 2000, and on March 16, 2000, NSSGA filed its complaint.  The two cases were consolidated on June 15, 2000.  NFIB filed its complaint on June 16, 2000, and was consolidated with the other two cases on September 12, 2000.  The plaintiffs argue, *inter alia*, that the NWPs exceed the Corps' authority under the CWA because the Corps only has jurisdiction over "discharges" of "pollutants," including

---

[4]      Other changes include the following:  (1) NWP 29 (single family housing) was modified to reduce acreage limitation to 1/4-acre and required preconstruction notification for all activities; (2) NWPs 39, 40, 42, and 43 were modified to include a 300-linear foot limit for filling and excavation activities in stream beds that normally have flowing water; (3) GC 25 was added to restrict use of certain NWPs in designated critical resource waters; (4) GC 26 was added to limit use of certain NWPs to place permanent, above-grade fills in some areas of 100-year floodplains; (5) GCs 9 and 19 were modified to add additional water quality protections, such as the use of vegetated buffers and water quality management plans; and (6) GC 13 was modified to include a thirty-day completeness review period of Corps' review of preconstruction notifications.  *See* 65 Fed. Reg. at 12,818.

dredged or fill material, into "waters of the United States," the NWPs exceed the Corps' authority under the CWA because the Corps can only issue NWPs for categories of activities that are similar in nature and will cause only minimal adverse environmental impacts, that the Corps acted arbitrarily and capriciously in the issuance of the replacement permit NWPs, that the Corps did not conduct a flexibility analysis as required by the Regulatory Flexibility Act ("RFA"), 5 U.S.C. §§ 601 *et. seq.*, and that the NWPs violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et. seq.*, because the Corps did not conduct a Programmatic Environmental Impact Statement.[5] On February 15, 2001, all three sets of plaintiffs filed motions for summary judgment, and the defendants and intervenors responded with cross-motions for summary judgment on June 14, 2001.

While the parties' cross-motions for summary judgment were pending, on January 15, 2002, the Corps re-issued all existing NWPs and GCs with some modifications. *See* 67 Fed. Reg. 2020 (Jan. 15, 2002). Because the NWPs were reissued, the Court to which the case was initially assigned permitted the parties to submit supplemental complaints and pleadings. While that supplemental briefing was in progress, this case was reassigned to this Court on April 9, 2002. The parties completed their supplemental filings on August 12, 2002. On November 26, 2003, this Court ruled that the "Corps' issuance of the new NWPs and GCs, while constituting the completion of a decisionmaking process, does not constitute a 'final' agency action because no legally binding action has taken place as to any given project until

---

[5] Plaintiff NSSGA's Complaint additionally contained claims alleging violations of the Tenth Amendment by defendant, but these claims were later withdrawn. (*See* Notice of Filing of Additional Authorities, Nov. 4, 2003.)

5

either an individual permit application is denied or an enforcement action is instituted." *Nat'l Ass'n of Home Builders*, 297 F. Supp. 2d at 78. Our Circuit Court, on July 29, 2005, reversed and remanded this Court's ruling on the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 551 *et. seq.*, and RFA claims, and affirmed this Court's dismissal of the NEPA claims. *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1289 (D.C. Cir. 2005). Specifically, our Circuit Court found that the NWPs issued by the Corps constituted final agency action subject to challenge under the APA, *id.* at 1281, and that the APA challenge to the NWPs is "ripe for judicial review," *id.* at 1284. Our Circuit Court also found that the Corps' issuance of the NWPs constituted final agency action in the form of a legislative rule, that plaintiffs' challenge focused on the Corps' compliance with sections 604 and 605 of the RFA, *id.* at 1285-86, and that the claim was ripe for review, *id.* at 1286. As the case was remanded to this Court for further proceedings consistent with the ruling of our Circuit Court, supplemental pleadings were filed by the parties, and this Court held oral argument on the remaining claims on January 30, 2006.[6]  *Id.* at 1274-75.

## STANDARD OF REVIEW

## I.  Summary Judgment

Summary judgment is appropriate when the pleadings and the record demonstrate that

---

[6]    On January 5, 2006, Counsel for the Corps, NAHB, and NFIB jointly submitted to the Court a Motion for Partial Consent Judgment on the RFA claims brought by NAHB and NFIB. (Dkt. # 137.) NSSGA did not object to this motion, and intervenor-defendants National Resources Defense Council ("NRDC") and the Sierra Club stated in the motion: "Without consenting to any judgment against NRDC and Sierra Club, without endorsing the characterizations contained in the motion for partial consent judgment and accompanying proposed order, and without waiving any rights, NRDC and Sierra Club do not oppose the relief requested in said motion." (*Id.* at 2-3.)

"there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and the Court draws all reasonable inferences regarding the assertions made in a light favorable to the non-moving party, *Biodiversity Conservation Alliance v. U.S. Bureau of Land Mgmt.*, 404 F. Supp. 2d 212, 216 (D.D.C. 2005) (citing *Flynn v. Dick Corp.*, 384 F. Supp. 2d 189, 192-93 (D.D.C. 2005)). "[W]hen ruling on cross-motions for summary judgment, the Court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed." *Barr Labs., Inc. v. Thompson*, 238 F. Supp. 2d 236, 244 (D.D.C. 2002) (citing *Rhoads v. McFerran*, 517 F.2d 66, 67 (2d Cir. 1975)).

In ruling on the merits of an administrative decision on a claim brought under the APA, the Court must look to the administrative record. *See Richards v. INS*, 554 F.2d 1173, 1177 (D.C. Cir. 1977). Because of this, no additional fact-finding is necessary and summary judgment is appropriate. *See Young v. Gen. Servs. Admin.*, 99 F. Supp. 2d 59, 65 (D.D.C. 2000); *Lun Kwai Tsui v. Att'y Gen. of the U.S.*, 445 F. Supp. 832, 835 (D.D.C. 1978) ("[S]ummary judgment is appropriate after a review of the administrative record.").

## II.    APA Review

In actions brought under the APA, an agency's final rule or action will be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law." 5 U.S.C. § 706(2)(A); *see Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994); *see also Envtl. Integrity Project v. EPA*, 425 F.3d 992, 995 (D.C. Cir. 2005). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of an agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*Motor Vehicle Mfrs.*"). A court must also set aside an agency decision if it lacks "substantial evidence" in the record to support the conclusion. 5 U.S.C. § 706(2)(E); *A.T. & T. Corp. v. FCC*, 86 F.3d 242, 247 (D.C. Cir. 1996). This is a highly deferential standard of review. *See id.* Under Section 553 of the APA, when promulgating an agency rule, the agency must provide adequate notice and opportunity to comment on the proposed rule. 5 U.S.C. § 553. If the agency fails to provide this notice and opportunity to comment or the notice and comment period is inadequate, the "regulation must fall on procedural grounds, and the substantive validity of the change accordingly need not be examined." *AFL-CIO v. Donovan*, 757 F.2d 330, 338 (D.C. Cir. 1985).

## DISCUSSION

Plaintiffs raise a myriad of challenges to the Corps' issuance of the replacement NWPs and GCs in 2000 and the re-issuance of the NWPs and General Conditions in 2002 and several underlying claims. The main claims, however, can be boiled down to the following: 1) that the Corps did not provide adequate notice and opportunity to comment before issuing the NWPs challenged by plaintiffs and that the NWPs and GCs are not the

8

logical outgrowth of the proposals; 2) that the Corps acted arbitrarily and capriciously and abused its discretion in performing a regionalized analysis of the "minimal adverse environmental effects" the NWPs would have on the environment; 3) that the Corps did not provide a reasonable basis for the acreage limitations and pre-construction notification requirements for NWPs; 4) that the restrictions in the use of NWPs in the 100-year floodplains were arbitrary and capricious and are not consistent with the Corps' authority; 5) that the regulation of aggregate and hard rock/mineral mining as activities "similar in nature" is arbitrary and capricious; 6) that the Corps did not have the statutory authority to condition NWPs to assure protection of water quality; 7) that the utilization of vegetated buffers in mitigation as referenced in GC 19 is not reasonably related to the disposal of dredged and fill material and, therefore, is beyond the Corps' authority; and 8) that the issuance of NWP 29 is arbitrary and capricious.[7]  The Corps counters, in essence, that the issuance of the replacement NWPs and GCs and the re-issuance of the NWPs and GCs in 2002 were in accordance with Section 404 of the CWA, were proper under the APA, and were neither arbitrary and capricious, nor contrary to law.  For the following reasons, the Court agrees with the Corps and GRANTS its motion for summary judgment

---

[7]     The following claims of the plaintiffs will be addressed in footnotes:  1) that the Supreme Court's decision in *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers* ("*SWANCC*"), 531 U.S. 159 (2001), necessitates a remand of the NWPs and the GCs to the Corps for reconsideration of the permits in light of the guidance provided in that decision as to the Corps' jurisdictional limits; 2) that the NWPs addressing excavation activities exceed the Corps' authority; 3) that the NWPs and the GCs promulgated by the Corps violate the "streamlining" of the permit process as required by the CWA; 4) that the Corps violated Section 404(e)(2) of the CWA when it revoked and modified NWP 26; and 5) the request that the Court reinstate NWP 26 while the matter is on remand before the Corps for reconsideration in light of the Court's ruling.

**I.**      **The Corps Did Provide Adequate Notice and Opportunity to Comment Before Issuing the NWPs Challenged by the Plaintiffs and the NWPs Are the Logical Outgrowth of the Proposals.**

Plaintiffs allege that the Corps "failed to afford the public adequate opportunity to comment" on the Replacement Permit Rule, the Replacement Permits, the Replacement GCs, the Reissued Permits, and the Reissued GCs.  In particular, plaintiffs allege that the final Replacement Permits and Reissued Permits were not the logical outgrowth of the proposed permits in regard to the acreage limitations placed on certain NWPs.  (Pls. NSSGA's, ARTBA's, & NPPC's Mem. Supp. Pls.' Mot. Summ. J. 41-44 ("NSSGA's Mem.").)  The Corps contends that plaintiffs were on notice of the possible changes to the NWPs and GCs and, in particular, that the acreage limitations would be reduced, and, thus, the issuance of NWPs with lower acreage limitations is a logical outgrowth of the proposed NWPs.  (Mem. P. & A. Supp. Def.'s Cross-Mot. Summ. J. & in Opp'n Pls.' Mots. Summ. J. 76-79 ("Corps' Mem.").)  For the following reasons, the Court agrees with the Corps that adequate notice and opportunity for comment were provided before the issuance of the NWPs and GCs, and that the particulars of the NWPs, including the smaller acreage limitations of NWPs 43 and 44, are the logical outgrowth of the proposed NWPs and GCs.

When an agency seeks to promulgate a rule, or in this case a NWP or GC under the CWA, the APA requires that the agency publish notice of the rule in the Federal Register and then give interested parties an opportunity to comment.  5 U.S.C. § 553.  The notice must contain "either the terms or substance of the proposed rule or a description of the subjects

and issues involved." *Id.* § 553(b)(3).  If notice is inadequate, the "regulation must fall on procedural grounds, and the substantive validity of the change accordingly need not be examined." *AFL-CIO v. Donovan*, 757 F.2d at 338.

An agency satisfies the notice requirement when the final rule constitutes a "logical outgrowth" of the proposed rule. *Ne. Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 951-52 (D.C. Cir. 2004).  "A rule is deemed a logical outgrowth if interested parties 'should have anticipated' that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period." *Id.* at 952 (quoting *City of Waukesha v. EPA*, 320 F.3d 228, 245 (D.C. Cir. 2003)).  Furthermore, the key focus in assessing logical outgrowth is "whether the purposes of notice and comment have been adequately served." *Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1311 (D.C. Cir. 1991).  Our Circuit has stated that "[t]his means that a final rule will be deemed the logical outgrowth of the proposed rule if a new round of notice and comment would not provide commentators with 'their first occasion to offer new and different criticisms which the agency might find convincing.'" *Id.* (quoting *United Steelworkers of Am. v. Marshall*, 647 F.2d 1189, 1225 (D.C. Cir. 1980)).  If a "final rule deviates too sharply from the proposal, affected parties will be deprived of notice and an opportunity to respond to the proposal." *AFL-CIO*, 757 F.2d at 338 (quoting *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 547 (D.C. Cir. 1983)).  A final rule is not necessarily invalid for lack of notice, however, simply because the position it adopts differs somewhat from the position in the proposed rule. *AFL-*

*CIO*, 757 F.2d at 338.

Our Circuit, in *Environmental Integrity Project v. EPA*, 425 F.3d 992 (D.C. Cir. 2005), stated that a final rule is not the logical outgrowth of the proposed rule if the agency's final rule is the *opposite* of the proposed rule. *Id*. at 998. Our Circuit noted that it has "refused to allow agencies to use the rulemaking process to pull a surprise switcheroo on regulated entities." *Id*. at 996. The Court added, "[i]f the APA's notice requirements mean anything, they require that a reasonable commenter must be able to trust an agency's representations about *which particular* aspects of its proposal are open for consideration." *Id*. at 998 (emphasis in original). In that case, our Circuit vacated the final rule because a logical outgrowth of a proposed rule "does not include the Agency's decision to repudiate its proposed interpretation and adopt its inverse." *Id*.

On June 17, 1996, the Corps published a "Notice of Intent and Request for Comments" concerning the re-issuance of existing NWPs and GCs, and the issuance of four new NWPs. 61 Fed. Reg. at 30,780. In response to this notice, the Corps received over "4,000 comment documents." 61 Fed. Reg. at 65,875. In response to the Corps' July 1, 1998 "Notice of Intent and Request for Comments" concerning the issuance of six new NWPs and modifying six existing NWPs after NWP 26 expired, *see* 63 Fed. Reg. 36,040, 36,040 (July 1, 1998), the Corps' additional modifications to the proposed NWPs on October 14, 1998, *see* 63 Fed. Reg. 55,095 (Oct. 14, 1998), and the additions to the proposal issued on July 21, 1999, *see* 64 Fed. Reg. at 39,252, the Corps extended the forty-five-day comment period an

additional thirty days. 65 Fed. Reg. at 12,818. Public hearings on the July 1, 1998 Notice were held across the country and a public hearing was held on August 19, 1998, in Washington, D.C. 65 Fed. Reg. at 12,824. In response to the August 9, 2001 "Notice of Intent and Request for Comment," *see* 66 Fed. Reg. 42,070 (Aug. 9, 2001), which reissued the NWPs and the GCs along with some modifications to definitions within, the Corps received "over 2,100 comments and had 19 people attend" the September 26, 2001 public hearing in Washington, D.C. 67 Fed. Reg. at 2027. Therefore, plaintiffs and other interested parties had adequate notice and opportunity to comment on the modifications, issuance, or re-issuance of the NWPs and GCs.

The main issue here is whether the particulars of the modified and reissued NWPs and GCs were the logical outgrowth of the proposed NWPs and GCs. While the NWPs that were modified, issued, and re-issued are not *exactly* the same as the proposed NWPs eventually issued and re-issued, *compare* 64 Fed. Reg. 39,252 (July 21, 1999) *with* 65 Fed. Reg. 12818 (Mar. 9, 2000); *compare* 66 Fed. Reg. 42,070 (Aug. 9, 2001) *with* 67 Fed. Reg. 2020 (Jan. 15, 2002), they do not have to be identical in order to be a logical outgrowth of the proposals, *see AFL-CIO*, 757 F.2d at 338. Plaintiffs and other interested parties were on notice that there would be changes to "particular aspects" of the NWPs, including the acreage limitations, and that the changes would most likely lead to a reduction in the acreage limitations. *See Envtl. Integrity Project*, 425 F.3d at 998. Plaintiffs were also aware of what aspects of the proposed NWPs and GCs were under consideration. *See id.*

Specifically as to NWP 43, while the Corps did state in its July 21, 1999 Notice that it was "proposing to retain the 2 acre limit for the construction of new SWM facilities" under NWP 43, 64 Fed. Reg. at 39,327, the fact is that the Corps was considering lowering the acreage limit and a limit below two acres was being considered ("commenters recommended acreage limits for the construction of new SWM facilities, which ranged from 1 to 5 acres") and, therefore, the lower acreage limit is a logical outgrowth of the proposal. *Id.* In regard to NWP 44, while the Corps proposed a "2 acre limit for a single and complete mining project" in the July 21, 1999 Notice, again, several options were being considered (including a sliding scale), and the final lower acreage limit was a logical outgrowth of the proposal and interested parties were on notice of this possible outcome. *See id.* at 39,332.

The notices and requests for comments released by the Corps made all interested parties aware that changes and modifications to the NWPs and GCs were imminent. Just because the final NWPs contained lower acreage limits than the Corps' initial proposals does not mean *per se* that they are not the logical outgrowths of the proposals. *See AFL-CIO*, 757 F.2d at 338. All interested parties were aware that the final NWPs and GCs would be more protective of the environment and the waters of the United States; hence, a more protective NWP or GCs is a logical endpoint, especially considering the fact that the objective of the CWA is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Accordingly, plaintiffs' claim that the Corps violated the notice and opportunity for adequate comment requirements of the APA and the

CWA, 33 U.S.C. § 1344(e)(1), is not persuasive.

## II.    The Corps Did Not Act Arbitrarily or Capriciously or Abuse Its Discretion in Performing a Regionalized Analysis of the "Minimal Adverse Environmental Effects" the NWPs Would Have on the Environment.

Plaintiffs allege that the Corps acted arbitrarily and capriciously, and abused its discretion, in performing a regionalized analysis of the "minimal adverse environmental effects" the NWPs would have on the environment.[8]  (*See* Mem. Supp. Pl. NAHB's Mot. Summ. J. 17-32 ("NAHB's Mem.").)  The Corps argues that the NWPs and GCs issued by the Corps do not violate the APA in their regionalized analysis of the "minimal adverse

---

[8]    Plaintiffs contend that defendant fundamentally misconstrued the scope of its regulatory authority under the CWA, 33 U.S.C. § 1251 *et seq.*, as established in *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers* ("*SWANCC*"), 531 U.S. 159 (2001), and that this jurisdictional misconstruction undermines defendant's actions regarding the issuance of NWPs. Specifically, plaintiff NAHB contends that in assessing the effects of fills authorized under NWP 26, defendant improperly considered the effects of fills in isolated waters that are beyond the defendant's jurisdiction (NAHB's Mem. 13), and plaintiff NSSGA argues that defendant's issuance of Replacement Permits is in "direct conflict" with the *SWANCC* decision because they seek to regulate discharges into "ephemeral streams" that it considers beyond defendant's jurisdiction to regulate (NSSGA's Mem. 13). Accordingly, plaintiffs demand that "[t]he Corps' [permit] decisions must be vacated, the status quo restored, and this action remanded to the Corps to reconsider in light of *SWANCC*." (NAHB's Mem. 17.)
    The CWA explicitly provides that "the objective of this chapter is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The Act provides that the Army Corps of Engineers may issue permits that "will have only minimal cumulative adverse effect on the environment." 33. U.S.C. § 1344(e)(1). Defendant has correctly noted throughout its pleadings that "its analysis of cumulative adverse impacts did not depend on nationwide mathematical calculation of the jurisdictional waters covered by the NWPs." (*See, e.g.*, Corps' Supp. Mem. in Support of Defs.' Mot Summ. J. 12 ("Corps' Suppl. Mem.").) The language of CWA Section 1344(e)(1) is broad, and no language limits the "environment" on which cumulative adverse effects are to be assessed.
    Moreover, while plaintiffs are correct that the Supreme Court's decision in *SWANCC* makes clear that the Corps' regulatory jurisdiction is limited to "waters of the United States," this holding is irrelevant to the instant issue. As defendant rightly notes, a body of water does not become a "water of the U.S." and come within its regulatory jurisdiction because of an NWP; rather, the NWP simply specifies the permit criteria for bodies of water that are already within the Corps' regulatory jurisdiction.
    Accordingly, plaintiff NAHB's contention that defendant incorrectly considered the adverse effects on the environment as a whole—including areas beyond its regulatory jurisdiction—when issuing the Replacement Permits is without merit. Plaintiff NSSGA's contention that defendant seeks to regulate waters outside of its jurisdiction by the terms of its Replacement Permits must similarly be rejected.

environmental effects" and that the Corps did not violate the APA by not defining the term "minimal adverse environmental effects." (*See* Corps' Mem. 29-30, 37-39.)   For the following reasons, the Court agrees with the Corps that the NWPs and GCs do not violate the provisions of the APA.[9]

A court must set aside an agency decision if it lacks "substantial evidence" in the record to support the conclusion. 5 U.S.C. § 706(2)(E); *A.T. & T. Corp. v. FCC*, 86 F.3d 242, 247 (D.C. Cir. 1996).   In deciding if there is "substantial evidence" in the record to support an agency's position, the Court's analysis is limited to determining whether the agency's decision was "rational and based on consideration of the relevant factors." *FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 803 (1978).   That said, an agency must provide a "clear and coherent explanation" for its ruling. *Cf. Tripoli Rocketry Ass'n, v. ATF*, 437 F.3d 75, 81 (D.C. Cir. 2006).   Section 706 of the APA requires this Court to consider the administrative record in its entirety to determine the factors the agency considered in making its decision. 5 U.S.C. § 706; *see Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419-20 (1971).   "To survive review under the 'arbitrary and capricious' standard, an agency must 'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005) (citing *State Farm*, 463 U.S. at 43) (internal quotation marks omitted).   An agency must respond meaningfully

---

[9]   It should be noted that in a letter to the Corps, NAHB conceded that the "NWP program . . . results in only minimal adverse environmental impacts." (NAHB Suppl. Mem., Ex. 2 at 12.)

to objections raised and those responses must be facially legitimate; if it fails to do so the Court will render its decision arbitrary and capricious. *Id.; see also Public Serv. Comm'n v. FERC*, 397 F.3d 1004, 1008 (D.C. Cir. 2005); *Canadian Ass'n of Petroleum Producers v. FERC*, 254 F.3d 289, 299 (D.C. Cir. 2001). However, the agency's decision need not be a "model of analytical precision," *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1404 (D.C. Cir. 1995), and the agency's decision will be upheld even if it is not ideally clear as long as the "agency's path may be reasonably be discerned," *id.* (internal quotation marks omitted) (quoting *Bowman Transp., Inc. v. Arkansas-Best Motor Freight Sys.*, 419 U.S. 281, 286 (1974)). The agency's decision must contain "'a rational connection between the facts found and the choice made,'" *Motor Vehicle Mfrs.*, 463 U.S. at 43 (quoting *Burlington Trucking v. U.S.*, 371 U.S. 156, 168 (1962)); yet, if the decision "merely parrots the language of the statute without providing an account of how it reached its results," then the agency has not provided an adequate explanation for its actions, *Dickson*, 68 F.3d at 1405.

The CWA was enacted in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). In passing the Act, Congress provided the Corps the ability to issue general, and individual permits, to parties to discharge pollutants, such as dredged or fill material, into navigable waters of the United States. *Id.* § 1344. However, the Corps can only issue general permits that "will cause only minimal adverse environmental effects when performed separately" or cumulatively. *Id.* § 1344(e)(1).

In the Corps' March 9, 2000 Final Notice that issued five new NWPs and two new GCs and modified six NWPs and nine GCs which were to replace NWP 26 when it expired, the Corps made it clear that it appreciated:

> that the terms and conditions of the new and modified NWPs may cause some activities with minimal adverse effects on the aquatic environment to be subject to the individual permit process. It is important to note that aquatic resource functions and values differ greatly across the country. When developing NWPs that have national applicability, there will be many parts of the country where the terms and limits of the NWPs will not authorize some activities that have minimal adverse effects on the aquatic environment.

65 Fed. Reg. at 12,820. Thus, it is clear from this statement that the Corps purposefully set the NWPs at a low level in order to err on the side of protecting the environment when allowing the discharge of pollutants into the navigable waters of the United States. This approach, although, disagreeable to the plaintiffs, is not only natural, but reasonable in light of the industrial permit options available to those whose activities will have minimal adverse effects on the environment.

Indeed, in the January 15, 2002 Final Notice that re-issued all existing NWPs and GCs, modified some definitions, and issued one new GC, the Corps specifically stated as a part of its reasoning that because aquatic resources and values differ so greatly across the country, "minimal effects determinations for proposed NWP activities should be made at the local level by district engineers." 67 Fed. Reg. at 2027-28. Thus, the Corps, in essence, concluded that questions necessitating technical certainty should be developed at the local, not national, level.

By setting a baseline that is low and more protective of these waters against the discharge of pollutants, the Corps chose to protect the waters of the United States that are more sensitive to discharged pollutants than waters that are less affected by a similar discharge. This "path" is reasonably discernable from the final notices the Corps has issued. *See Dickson*, 68 F.3d at 1404; 65 Fed. Reg. 12,818 (Mar. 9, 2000); 67 Fed. Reg. 2020 (Jan 15, 2002). Indeed, if the national baseline is not protective enough for certain areas, regional district engineers can "add special conditions to the NWP authorization to ensure that the activity results in no more than minimal adverse environmental effects." 67 Fed. Reg. at 2027; *see* 65 Fed. Reg. at 12, 821.

While the Corps acknowledges that the lower acreage limits and pre-construction notification thresholds may require "certain activities that were previously authorized by NWPs" to "require individual permits, and that it takes more time to authorize those activities," 67 Fed. Reg. at 2022, the limits and thresholds, as well as all the new or modified NWPs, were "necessary to ensure compliance with section 404(e) of the Clean Water Act,"[10]

---

[10]      Plaintiffs argue that the Corps issuance of the NWPs is contrary to the intent of Congress to create a "streamlined" system of general permits as expressed in Section 404(e) of the CWA. (NAHB's Mem. 24-27.) The Corps counters that the CWA does not "set a 'streamlining' standard that the Corps must meet" (Corps' Mem. 43), and that "[s]treamlining is not a statutory factor upon which to measure whether the NWPs are arbitrary or capricious or contrary to law," *id.* at 42-43. Section 404(e)(1) of the CWA, under which the NWPs and GCs are promulgated, states that the Secretary of the Army, acting through the Chief of Engineers, may issue NWPs "if the Secretary determines that the activities in such category are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e)(1). Nowhere does the statute state that the Secretary must enact NWPs that "streamline" the "authorization of minimal effects projects." (NAHB's Mem. 24.)
     While efficiency in the granting of permits for projects is a corollary of the issuance of NWPs, efficiency does not drive the creation of the NWPs — protecting the environment does. *See* 67 Fed. Reg. at 2022. The Corps issues the NWPs in order to create a baseline of activity that is allowed without one having to undergo the individual permitting process, and in doing so, the permits only allow activities

19

*id.* The decision documents for each of the NWPs, which were issued on January 4, 2002, and are part of the administrative record, discuss the impacts that the activities governed by these NWPs and GCs will have on the environment and the associated aquatic life. (*See, e.g.,* Suppl. A.R. 42, Decision Document Nationwide Permit 19, Civ. Act. No. 00-379, Dkt. # 89.) The different activities authorized by the NWPs and the different conditions of the aquatic environment in the United States require rules that can account for the complexities of protecting the diverse aquatic environment of the United States. *See* 65 Fed. Reg. at 12,819 ("Some complexity is unavoidable because different activities in waters of the United States do not have the same effects on the aquatic environment and each NWP must have different conditions to address those dissimilar impacts.").

A review of the record makes it clear that the Corps has adequately explained its reasoning behind the issuance and re-issuance of the NWPs and GCs.[11] While the Corps' reasoning may be unnecessarily lengthy, it is reasonable, supported by the facts, and its explanation clearly and adequately lays out the "path" of the Corps' logic and that logic has been adequately explained. *See Motor Vehicle Mfrs.*, 463 U.S. at 43 (quoting *Bowman*

---

that result in "minimal adverse environmental effects." *See id.* When working to protect the environment on a national level through the issuance of the NWPs, the effects that the permitted activities have on the environment is paramount to any efficiency that may result to the Corps or the permit seekers. Therefore, plaintiffs' argument fails.

[11]     While plaintiffs point to the fact that the Corps repeats the phrase "minimal adverse environmental effects" throughout the Final Notices as an indication that the Corps is only parroting the language of the statute as the core of its reasoning in the issuance of the NWPs and GCs, *see Dickson*, 68 F.3d at 1405, the Corps has adequately explained its decision to promulgate the NWPs and GCs, as they are necessary to protect those parts of the environment that are most sensitive to the discharge of pollutants, *see* 65 Fed. Reg. at 12,819-20 and 67 Fed. Reg. at 2022.

*Transp., Inc.*, 419 U.S. at 286); *Dickson*, 68 F.3d at 1404 (quoting *Bowman Transp., Inc.*, 419 U.S. at 286)   Accordingly, this Court finds that the Corps did not act arbitrarily or capriciously, or abuse its discretion, in performing a regionalized analysis of the "minimal adverse environmental effects" the NWPs would have on the environment.[12]

Plaintiffs also claim, in essence, that the Corps' failure to define the term "minimal adverse environmental effect" is arbitrary, capricious, and an abuse of discretion. (NAHB's Mem. 19-20; Pls.' Joint Suppl. Filing Supp. Pls.' Mots. Summ. J. 2-7.)   Conversely, the Corps claims that it is not only not required to define this term, but that such a definition is impossible to determine on a national level due to the diversity of the aquatic environments of the waters of the United States. (Corps' Mem. 37-39; Def.'s Post-Arg. Br. 1-5.)   The Court agrees with the Corps. *See* 65 Fed. Reg. at 12,862-63.   What is a minimally adverse environmental impact in Arizona, for example, will not be the same as the effect on the bayous of Louisiana.   Thus, the Corps has reasonably articulated its reasoning behind the

---

[12]     Plaintiffs additionally ask the Court "to enjoin the expiration of NWP 26 and reinstate its terms." (NSSGA's Mem. 26.) As correctly noted by Intervenor-Defendants NRDC and Sierra Club, the Court lacks the authority to provide this remedy. (*See* Def.-Intervenors NRDC's & Sierra Club's Post-Arg. Suppl. Mem. Supp. Defs.' Cross-Mots. Summ. J. 2.) As a threshold matter, as Plaintiff NAHB acknowledges in its Motion for Summary Judgment, NWP 26 has *already* expired (NAHB's Mem. 34), and an expired permit is "null and void," 33 C.F.R. § 330.6(b), and, therefore, cannot be reinstated. Second, the CWA Section 404(e)(2) explicitly provides that "[n]o general permit issued under this subsection shall be for a period of more than five years after the date of its issuance." 33 U.S.C. § 1344(e)(2). Again, because NWP 26 was issued more than five years ago, it has expired. Because the CWA gives the authority to issue permits to the Corps and not the courts, § 1344(e)(1), this Court lacks the power to reinstate NWP 26. Finally, the CWA provides that the Corps "may" issue general permits. *Id.* Notably, the statute does not say the Corps "shall" issue general permits. Thus, issuance of general permits is a discretionary decision of the Corps. *See id.* Moreover, this decision is to be made only after the Corps "determines" that the activities authorized by the permit are similar in nature and will have only a "minimal adverse environmental effect." *Id.* The Corps has not made such a determination with regard to a re-issuance of NWP 26, and this Court is ill-equipped to do so. Accordingly, this Court denies plaintiffs' request to enjoin the expiration of NWP 26 and reinstate its terms.

promulgation of the NWPs and the GCs and that reasoning is supported by the record. Therefore, the Corps is not required to define the term "minimal adverse environmental effect," and, thus, did not act arbitrarily or capriciously or contrary to law.[13]

## III.   CWA Section 404(e) Allows the Corps to Decide on a Reasonable Basis the Particular Aspects for the NWPs and the GCs.

Plaintiffs claim that the Corps exceeded its statutory authority by issuing NWPs and GCs with more restrictive regulations than had previously been allowed under NWP 26, or were initially under consideration by the Corps during the notice and opportunity to comment period prior to the issuance, and re-issuance, of the NWPs and GCs. (NAHB's Mem. 25-31; NSSGA's Mem. 13-41.)  The Corps asserts that it did not act arbitrarily, capriciously, or contrary to law when it set a national baseline of what would constitute "minimal adverse environmental effects" for the various activities and projects that would be allowed to proceed under the NWPs or GCs.  *See supra* 15-22.  For the reasons set forth below, the Court agrees with the Corps.[14]

---

[13]     Plaintiff NSSGA contends that the certain NWPs exceed defendant's jurisdiction because they seek to regulate "excavation" activities, and defendant's regulatory jurisdiction is limited to the discharge of "pollutants" and "dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. §§ 1342(a), 1344(a).  Plaintiff correctly notes these limitations on defendant's regulatory jurisdiction and that not all excavations result in a discharge that defendant may regulate. (*See* Pl. NSSGA's Mot. Summ. J. 17-20.)  However, the NWPs address only those activities that result in a discharge that defendant *may properly regulate.  See* 67 Fed. Reg. at 2020.  Thus, the NWPs did not exceed defendant's jurisdiction, and plaintiffs claim must therefore fail.

[14]     Plaintiffs additionally argue that the Corps violated Section 404(e)(2) of the CWA by revoking or modifying NWPs without expressly finding that the NWPs have an adverse impact on the environment or that the "activities are more appropriately authorized by individual permits." (*See* NAHB Mem. 32-34; *see also* NAHB's Suppl. Mem. 14.)  The Corps argues that NWP 26 expired and, therefore, was not revoked or modified, and that such findings were made when the replacement NWPs were issued. (Corps' Mem. 44-48.)  Section 404(e)(2) of the CWA states that an NWP "may be revoked or modified by the Secretary if . . . the Secretary determines that the activities authorized by such general permit

### 1.    Acreage Limitations and PCN Requirements in the NWPs

Initially, Plaintiffs argue that the setting of a 1/2-acre limit on project impacts and a

1/10-acre pre-construction notice ("PCN") requirement in the NWPs, including NWP 39, is

arbitrary and capricious, because the Corps did not adequately explain its reasoning behind

the implementation of those particulars. (NAHB's Mem. 21-23; NAHB's Suppl. Mem. 5-7;

NSSGA's Mem. 23-30; NSSGA's Suppl. Mem. 6-7.) The Court disagrees. The Corps used

its expertise to determine that a 1/2-acre limit and a 1/10-acre PCN requirement were the best

limitations and requirements to include in the NWPs to ensure that only "minimal adverse

environmental effects" were caused in the discharging of pollutants. *See* 67 Fed. Reg. at

2023-24; *see also* 65 Fed. Reg. at 12,825-26. The Corps specifically found that the 1/2-acre

limit was appropriate and should not be higher because higher acreage limits would result

in the "loss of non-wetland waters," 67 Fed. Reg. at 2023, and "[o]pen waters such as

streams, ponds, lakes, estuaries, and the oceans, are important components of the overall

---

[NWP] have an adverse impact on the environment or such activities are more appropriately authorized by individual permits." 33 U.S.C. § 1344(e)(2).

First, NAHB has admitted that NWP 26 has already expired. (NAHB's Mem. 34.) Moreover, because NWP 26 was issued over five years before NAHB's Supplemental Motion for Summary Judgment, the permit had expired, *see* 33 U.S.C. § 1344(e)(2), and, accordingly, no finding by the Corps was necessary. Even if at the time the Corps issued the new NWPs and modified several NWPs, NWP 26 was still active, the Corps made the requisite finding necessary under Section 404(e)(2) in its final notices, as it explained that the new or modified NWPs were necessary to ensure that only "minimal adverse environmental effects" resulted from the discharge of pollutants. *See* 65 Fed. Reg. at 12,820; *see also* 65 Fed. Reg. at 12,819 ("These new restrictions on use of the NWPs will substantially increase the protection of the Nation's aquatic environment," and "the new and modified NWPs are conditioned to ensure that only those activities that have minimal adverse effects on the aquatic environment are authorized by these permits"); *see also* 67 Fed. Reg. at 2028. It is clear from the Corps explanation that if NWP 26 was still active, it was revoked because of its adverse impact on the environment and because the Corps has determined that it would be more protective of the environment to require individual permitting for the activities formerly governed by NWP 26. *See* 65 Fed. Reg. at 12,820; *see also* 67 Fed. Reg. at 2022.

aquatic environment and provide valuable functions and environmental benefits," *id.* Indeed, the "NWP program encourages avoidance and minimization of impacts to wetlands, and most project proponents do not request NWP authorization to fill the maximum amount of wetlands under the NWP acreage limits." *Id.* In addition, the average impact of activities authorized under NWP 26 in 1995 was .36 acres. 61 Fed. Reg. at 65,892; *see also* 65 Fed. Reg. at 12,825 ("the vast majority of activities authorized by NWP 26 are below or slightly above 1/2 acre"). As for the 1/10-acre PCN requirement, the Corps instituted this requirement so that the district engineers could carefully review "activities to ensure that they result in no more than minimal adverse effects on the aquatic environment." 67 Fed. Reg. at 2024. Undoubtedly, requiring permittees to notify the Corps before construction significantly helps the Corps monitor the impact that the activities will have on the aquatic environment.

As this Court has already explained, not setting a national level and refusing to define the term "minimal adverse environmental effect" were reasonable decisions by the Corps. The Corps has adequately and clearly explained in a reasonable manner why the above requirements were included in the NWPs. *See Motor Vehicle Mfrs.*, 463 U.S. at 43; *see also Dickson*, 68 F.3d at 1404. Therefore, the Corps did not act arbitrarily or capriciously in enacting these acreage limitations and PCN requirements.

**2.    Restrictions in the Use of NWPs in 100-year-old Floodplains**

Plaintiffs claim that the enactment of GC 26, which "bars the use of certain NWPs in

the entire 100-year floodplain below the headwaters and in the floodway of the 100-year

floodplain above the headwaters," (NAHB's Mem. 28), is a "half-baked proposal," (*id.* at

29), and, therefore, is contrary to law and violates the APA,[15] (*id.* at 28-31; NAHB's Suppl.

Mem. 10-11; NSSGA's Mem. 30-36; NSSGA's Suppl. Mem. 7-9). Specifically, plaintiffs

claim that GC 26 violates the "streamlining" principle of Section 404 of the CWA[16] (*see*

NSSGA's Mem. 30-33), that the restrictions exceed the Corps' authority (NSSGA's Mem.

30-36), that the restrictions provide no environmental benefit (*id.*), that the restrictions are

not supported by data (NAHB's Suppl. Mem. 10), that they are inconsistent with FEMA

requirements (NAHB's Mem. 29; NSSGA's Suppl. Mem. 8-9; NAHB's Suppl. Mem. 10),

and that there is no rational connection between the NWPs affected by GC 26 and those that

are not (NSSGA's Suppl. Mem. 8).

However, GC 26, as issued on January 15, 2002, no longer includes a notification

requirement for the use of NWPs 12 and 14 below headwaters and for the use of NWPs 12,

13, 29, 39, 40, 42, 43, and 44 in the flood fringe above headwaters, no longer requires

documentation that the project meets FEMA-approved requirements, and no longer subjects

certain NWPs to GC 26. *Compare* 65 Fed. Reg. at 12,897 *with* 67 Fed. Reg. at 2093-94. In

---

[15]     Plaintiffs also claim that the Corps did not provide proper notice of the proposed GC. (NAHB's Mem. 29.) Yet, the Corps clearly provided notice of the GC in its July 21, 1999 Notice of Intent and Request for Comments, 64 Fed. Reg. at 39,348, and its August 9, 2001 Notice of Intent and Request for Comments, 66 Fed. Reg. 42,098. Therefore, plaintiffs claim of lack of notice to comment as to GC 26 in violation of the APA fails.

[16]     There is no such "streamlining" principle, and, therefore, plaintiffs' claim on this ground fails. *See supra* note 10. Indeed, the re-issued GC 26 is less burdensome for interested parties. 67 Fed. Reg. 2093-94.

addition, the Corps adequately explained changes made to the GC which include: 1) why the GC would use the 100-year floodplains identified by Flood Insurance Rate Maps or FEMA-approved local floodplain maps, 67 Fed. Reg. at 2072; 2) how GC 26 reinforces the "FEMA program to minimize impacts to flood plains," *id.* at 2073; 3) how GC 26 will strengthen floodplain policy and "reduce flood damages" as the Corps is "very concerned with the loss of life and property resulting from unwise development in the floodplain," *id.*; and 4) why the prohibitions outlined in GC 26 were removed from certain NWPs, *id.*

As for the claim that GC 26 is inconsistent with FEMA regulations, GC 26 requires permittees "to comply with the appropriate FEMA or FEMA approved local floodplain construction requirements," which they would have to follow regardless. 65 Fed. Reg. at 12,879. Therefore, GC 26 does not create an inconsistency or provide FEMA with a "veto power" over projects. As the Corps has adequately explained its rational for enacting GC 26, the Corps has not acted arbitrary or capriciously or contrary to law. *See Motor Vehicle Mfrs.,* 463 U.S. at 43; *see also Dickson,* 68 F.3d at 1404. Accordingly, plaintiffs' claims relating to the 100-year floodplains fail.

### 3.    Mitigation Through the Creation of Vegetated Buffers

Next, plaintiffs claim that the vegetated buffer mitigation requirement in certain NWPs and GCs exceeds the Corps' authority as the regulation does not relate to the effects of the discharge being permitted. (NAHB's Mem. 37-38; NSSGA's Mem. 38-40; NAHB's Suppl. Mem. 12-14; NSSGA's Suppl. Mem. 9.) The Corps counters that the vegetated buffer

mitigation is reasonably related to the discharge of dredged and fill material. (Corps' Mem. 53-55; Corps' Suppl. Mem.17-19.) The Court agrees with the Corps.

As stated in *United States v. Mango*, "permit conditions are valid if they are reasonably related to the discharge, whether directly or indirectly." 199 F.3d 85, 93 (2d Cir. 1999) (remanding to the district court for consideration of whether the conditions imposed were reasonably related to the discharge). Indeed, the Corps stated that "all mitigation, whether vegetated buffers or wetlands mitigation, must be related to the impacts authorized." 67 Fed. Reg. at 2066.

The Corps included the creation of vegetated buffers as part of its mitigation efforts because "[t]he Corps believes that vegetated buffers are a critical element of the overall aquatic ecosystem in virtually all watersheds." 67 Fed. Reg. at 2064. In explaining the need for the vegetated buffers, the Corps stated:

> Discharges of dredged or fill material into waters of the United States, which the Corps regulates under section 404 of the Clean Water Act, result in the loss of aquatic resource functions and values. The establishment and maintenance of vegetated buffers next to streams and other open waters offsets losses of aquatic resource functions and values and reduces degradation of these aquatic resources.

65 Fed. Reg. at 12,834. As to NWP 29, the vegetated buffers are required to "preclude water quality degradation due to erosion and sedimentation. In addition, vegetated buffers are not always required; they are required when "appropriate and practicable." 61 Fed. Reg. at 2092. Clearly, the requirement to establish and maintain vegetated buffers when practicable is reasonably related to the discharges of dredged or fill material. *Mango*, 199 F.3d at 93.

Accordingly, this requirement does not exceed the Corps' authority.

### 4.    Protection of Water Quality

Plaintiffs claim that the Corps lacks the authority to "review state water quality programs" under the CWA and to require permit seekers to submit water quality management plans to the Corps. (NAHB's Mem. 34-36; NSSGA's Mem. 36-38; NAHB's Suppl. Mem. 12-13; NSSGA's Suppl. Mem. 9.)   Plaintiffs also claim that GC 9 allows the Corps to "overrule" a State's authority to impose water quality management measures under Section 401 of the CWA. (NSSGA's Suppl. Mem. 9.)   The Corps maintains that it holds the authority to enact GC 9, and that Section 401 and 404 of the CWA, when read in conjunction, permit the regulation of water quality impacts by the Corps. (*See* Corps' Mem. 48-51; *see also* Corps' Suppl. Mem. 17.)   The Court finds that the Corps has the statutory authority under the CWA to enact GC 9 as it relates to water quality.

Section 401(a)(1) of the CWA requires that any seeker of a federal license or permit:

> shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate, or, if appropriate, from the interstate water pollution control agency having jurisdiction over the navigable waters at the point where the discharge originates or will originate, that any such discharge will comply with the applicable provisions of" [certain sections of the CWA].

33 U.S.C. § 1341(a)(1).   Section 401(b) states that "[n]othing in this section shall be construed to limit the authority of any department or agency pursuant to any other provision of law to require compliance with any applicable water quality requirements." 33 U.S.C. § 1341(b).   In addition, Section 401(d) states that any limitations or requirements set forth in

any state certification that assures compliance with certain sections of the CWA "shall become a condition on any Federal license or permit subject to the provisions of this section." 33 U.S.C. § 1341(d).

Thus, it is clear from a reading of the relevant statutes that the authority provided to the states to control water quality is not usurped by Section 401 and does not remove the Corps' authority to implement GC 9.  Moreover, the purpose of Section 401 is to preserve the authority for the States to set standards that are more stringent than the level of protection afforded in a federal permit, and, therefore, the purpose of this section is to *supplement* not *supplant* the requirements for obtaining a federal permit.  Section 401 ensures that state limitations and requirements, as related to water quality, will become part of the federal permit, *Monongahela Power Co. v. Marsh*, 809 F.2d 41, 53 n.114 (D.C. Cir. 1987), and nothing in Section 401 implies that a State's limitations or requirements allows that permit seeker to avoid the NWP-specific requirements to obtain a permit, *id.*  Accordingly, because the Corps has the authority to ensure that the discharging of dredged or fill material causes only minimal adverse environmental effects, *see* 33 U.S.C. § 1344(e)(1), the Corps also has the authority to require that a permit seeker "provide water quality management measures that will ensure that the authorized work does not result in more than minimal degradation of water quality." 67 Fed. Reg. at 2089.  Accordingly, plaintiffs' argument fails.

**5.**     **Regulation of Aggregate and Hard Rock/Mineral Mining as "Similar in Nature" Activities**

Finally, plaintiffs claim that the Corps acted arbitrarily and capriciously by "lumping" together hard rock/mineral mining and aggregate mining as activities that are "similar in nature" under NWP 44. (NSGGA's Mem. 21-22.) Plaintiffs rely on a statement made by the Corps in its July 21, 1999 Notice of Intent and Request for Comments that "[h]ard rock/mineral mining activities have greater potential for more than minimal adverse effects on the aquatic environment than aggregate mining activities." 64 Fed. Reg. at 39,331. The Corps contends that the two mining activities are similar in nature and any difference between the two is accounted for in NWP 44 itself. (Corps' Mem. 60-63.) Again, the Court agrees with the Corps.

The Corps can issue permits pertaining to those activities that produce "discharges of dredged or fill material if the Secretary determines that the activities in such category are similar in nature." 33 U.S.C. § 1344(e)(1). Indeed, when an agency is not dealing with "precise statutory standards" in making a determination, a "reviewing court[] should give the [agency] broad discretion." *Local 1325, Retail Clerks Int'l Ass'n v. NLRB*, 414 F.2d 1194, 1200 (D.C. Cir. 1969) (faced with imprecise standards in making a determination of a bargaining unit, the court found that it would give the Board broad discretion in making such a determination).

As to the issuance of NWPs, it is clear that there are not precise standards for what constitute activities that are similar in nature. However, both of the activities at issue here

30

are forms of mining and are governed by NWP 44 which is titled "Mining Activities." 67
Fed. Reg. at 2091. The Corps has found that hard rock/mineral mining and aggregate mining
"are sufficiently similar in nature to warrant issuance of a single NWP." 65 Fed. Reg. at
12,859. Indeed, where the two types of mining differ, the Corps treats the two activities
differently. *See* 67 Fed. Reg. at 2088-89. The reasoning behind the grouping of these two
activities is also clear. *See Dickson*, 68 F.3d at 1404. While there may be "considerable
differences in the impacts" of the two types of mining, *see* 63 Fed. Reg. at 36,054, given the
fact that the Corps has broad discretion in sorting activities as similar in nature, *see Local
1325*, 414 F.2d at 1200, the Court finds that the Corps did not act arbitrarily or capriciously
in issuing a single NWP for the two activities.[17]

## IV.    The Issuance of NWP 29 Was Neither Arbitrary nor Capricious.

Plaintiffs claim that the NWPs treat similar situations differently with no rational
justification.[18] (NAHB's Mem. 31-32; NAHB's Suppl. Mem. 11.) Specifically, plaintiffs

---

[17]    Plaintiffs also argue that the Corps acted arbitrarily in the issuance of subsection (j) of NWP 44,
which relates to aggregate mining. (NSSGA's Mem. 40-41.) NWP 44(j) provides that "no aggregate
mining can occur within stream beds where average annual flow is greater than 1 cubic foot per second
or in waters of the United States within 100 feet of the ordinary high water mark of headwater stream
segments where the average annual flow of the stream is greater than 1 cubic foot per second." 67 Fed.
Reg. at 2089. Aggregate mining within lower perennial streams is excluded. *Id.* The Corps claims that
the reduction in the scope of the applicable waters under NWP 44 will help cause only minimal adverse
environmental effects, 64 Fed. Reg. at 39,330, and that the reduction was in order "to better protect those
streams that support fish spawning areas." *Id.* at 39,331. Based on this explanation and the fact that the
Corps explained how certain stream relocation and diversion activities "cause the loss of waters of the
United States," *id.* at 39,333, the Corps has adequately explained this requirement under NWP 44. *See
Dickson*, 68 F.3d at 1404. Therefore, the Corps has acted neither arbitrarily nor capriciously.

[18]    It should be noted that the re-issued NWP 14 has "eliminated the distinction between public and
private linear transportation crossings" (NAHB's Suppl. Mem. 11), and, therefore, that element of
NAHB's claim that the Corps treats similar situations differently with no rational justification has been
addressed (*see id.*).

claim that the Corps fails to articulate its reasoning behind only allowing individual home owners to use NWP 29. (NAHB's Mem. 31; NAHB's Suppl. Mem. 11.) The Corps contends that NWP 29 can only be used in the construction of a single family residence by the person who will live in the home, because allowing NWP 29 to be used by contractors and developers will increase the use of NWP 29 and, therefore, increase impact to the environment as a result and that making such a distinction is within the Corps' authority. (*See* Corps' Mem. 65-68.) The Court agrees.

Clearly, Section 404 of the CWA allows the Corps to issue general permits that pertain to "discharges of dredged or fill material" that "will have only minimal cumulative adverse effect on the environment. 33 U.S.C. § 1344(e)(1). In determining that NWP 29 should only apply to residential home owners and not to contractors or developers, the Corps was ensuring that the cumulative effect of the permit would not cause more than minimal adverse environmental effects. The Corps' reasoning is clear. *See Dickson*, 68 F.3d at 1404. Accordingly, *the Corps issued NWP 29 within its authority as stated in Section 404(e)(1) of the CWA.*

## CONCLUSION

This Court finds that the Corps has not acted arbitrarily, capriciously, or contrary to the law in its issuance and re-issuance of the NWPs and GCs, as the Corps has adequately explained its reasoning behind its issuance of the NWPs and GCs and clearly acted within its authority. Therefore, for the foregoing reasons, the Court GRANTS defendants'

32

Cross-Motions for Summary Judgment and DENIES plaintiffs' Motions for Summary

Judgment. An appropriate Order will issue with this Memorandum Opinion.

RICHARD J. LEON
United States District Judge